IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DENNIS DIVENUTA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION NO. 09-3657 |
| BILCARE, INC., | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM**

YOHN, J.                                                                 March 30, 2011

     Plaintiff Dennis Divenuta ("Divenuta"), a citizen of New Jersey, brings this diversity action against Bilcare, Inc. ("Bilcare"), a Delaware corporation with its principal place of business in Pennsylvania, alleging breach of contract, promissory estoppel, and violation of Pennsylvania's Wage Payment and Collection Law ("WPCL"), 43 Pa. Stat. Ann. §§ 260.1 *et seq.* Currently before me is Bilcare's motion for summary judgment under Federal Rule of Civil Procedure 56. For the reasons set forth below, I will grant Bilcare's motion in part and deny it in part.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

     This case arises from an employment relationship between Divenuta and Bilcare. In a letter dated March 31, 2008, Divenuta, a former attorney and certified human-resources professional, was offered the position of vice president of business development at Bilcare, with

---

[1] Except as otherwise noted, the following facts are undisputed.

a base salary of $180,000 per year and an anticipated start date of April 21, 2008. (Def. Bilcare,

Inc.'s Separate Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J.

("Def.'s Facts") ¶¶ 4, 10; Mem. of Law in Supp. of Def. Bilcare, Inc.'s Mot. for Summ. J.

("Def.'s Br.") Ex. 1, Letter from Kathleen M. Roesing to Dennis Divenuta (Mar. 31, 2008)

("Offer Letter"), at 1, 3.) Under the terms of the offer, Divenuta was to be awarded a one-time

sign-on bonus of $20,000, payable in four equal installments. (Offer Letter at 1.)[2] The offer letter

also provided that Divenuta would be eligible for additional incentive payments, to be calculated

monthly and paid quarterly, equal to "the greater of (a) an override of ½% on gross revenue (less

pass-through costs) or (b) 50% of [Divenuta's] salary." (*Id.*) Divenuta was not guaranteed

employment for any specified period of time (*id.* at 2–3), but the offer letter provided that if

Divenuta's employment terminated "involuntarily for any reason other than cause, disability,

violation or perceived violation of an Agreement with a previous employer," Divenuta would be

entitled to "a severance package of six months['] salary and health benefit continuation" (*id.* at

2).

Divenuta signed the offer letter, acknowledging that the "letter does not constitute either

an employment contract or a guarantee of employment for a specified period of time." (*Id.* at

2–3.) The letter also cautioned that "all benefits and company policies may be subject to change."

(*Id.* at 2.)

Divenuta alleges that before accepting this offer, he "repeatedly advised" Bilcare's vice

president of human resources that he had a severely disabled child and that, because of the high

---

[2] The first $5,000 installment was to be paid within the first month of hire, and the remaining three $5,000 installments were to be paid within thirty days of the end of each three-month period beginning from Divenuta's date of hire. (*Id.*)

expenses associated with caring for his child, he "would require timely payment of all compensation promised," and alleges that the vice president of human resources assured him that all payments would be made in a timely manner. (Pl.'s Resp. to Def.'s Statement of Facts in Supp. of Def.'s Mot. for Summ. J. ("Pl.'s Resp. to Def.'s Facts") ¶ 37.) Divenuta further asserts that during the negotiation process, Bilcare "repeatedly guaranteed [him] the $25,000 incentive payments." (Pl.'s Resp. to Def.'s Facts ¶ 34; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Br.") Ex. A, Dep. of Dennis Divenuta (June 23, 2010) ("Divenuta Dep."), at 209:6–210:8, 293:8–294:5.)[3]

According to Divenuta, Bilcare paid the first three installments of his sign-on bonus—albeit late—but failed to pay the fourth and final installment. (Pl.'s Resp. to Def.'s Facts ¶ 22; Divenuta Dep. at 272:13–274:4.)[4] Bilcare made one quarterly incentive payment of $25,000 to Divenuta, but did not make any other incentive payments to him during the course of his employment. (Def.'s Facts ¶ 21.)

On February 4, 2009, Bilcare sent Divenuta an e-mail notifying him that "[d]ue to a business based decision to re-evaluate the salaries of all Bilcare PPR staff based on current financials," Divenuta's salary would be reduced from $180,000 to $100,000 per year, effective March 1, 2009. (Def.'s Br. Ex. 9 at 1–2.) The e-mail stated that "[t]his notice serves as notification that your salary will be decreased as stated above. Your acceptance or declination must be indicated on the attached form . . . . If you decide not to accept this revised salary, we

_____

[3] Bilcare disputes the allegations in this paragraph.

[4] Bilcare ultimately paid the final installment on April 13, 2010, after Divenuta filed his complaint. (Pl.'s Br. Ex. C.)

will consider this your voluntary resignation from Bilcare PPR." (*Id.* at 2.) Although Divenuta contends that he did not accept this salary reduction, he continued to work at Bilcare after his salary was reduced. (Def.'s Facts ¶ 20; Pl.'s Resp. to Def.'s Facts ¶ 20.)

On September 21, 2009, Bilcare notified Divenuta that the company was terminating his employment for cause. (Def.'s Br. Ex. 11.)

On August 11, 2009, while Divenuta was still employed at Bilcare, he filed this action, alleging that Bilcare had breached the terms of his offer letter by reducing his salary and by failing to pay him the sign-on bonus and incentive compensation to which he was entitled. Divenuta also sought recovery under the doctrine of promissory estoppel and under the WPCL.

After discovery, Bilcare filed this motion for summary judgment.

## II.    STANDARD OF REVIEW

A motion for summary judgment will be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

---

[5] Amendments to the Federal Rules of Civil Procedure, including Rule 56, took effect on December 1, 2010. Because the amendments "govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending," Order of the United States Supreme Court Amending the Federal Rules of Civil Procedure (Apr. 28, 2010), and because the substantive standard for granting summary judgment remains unchanged, I refer to the amended rule.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The moving party bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a *genuine issue for trial*," *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted), offering concrete evidence supporting each essential element of its claim, *see Celotex*, 477 U.S. at 322–23. The nonmoving party must show more than "[t]he mere existence of a scintilla of evidence" for elements on which it bears the burden of production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

When a court evaluates a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms*, 90 F.3d at 744 (internal quotation marks and citations omitted). "[A]n inference based upon a speculation or conjecture," however, "does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## III.   DISCUSSION

Seeking relief under the theories of breach of contract, promissory estoppel, and violation of the WPCL, Divenuta claims that he is entitled to damages for the reduction in his salary and for Bilcare's failure to pay the incentive compensation that he alleges was owed to him under the terms of his offer letter.

### A.   Breach-of-Contract Claims

Divenuta claims that Bilcare breached its contract with him by reducing his salary and by failing to pay incentive compensation owed to him.[6] In addition to seeking payment of the amounts he alleges are owed to him under the terms of his offer letter, Divenuta seeks compensatory damages for the decline in his credit rating, which he contends was caused by Bilcare's failure to pay compensation owed to him.

### 1.   Reduction in Salary

Divenuta claims that, under the terms of his offer letter, he was promised a salary of $180,000 and that Bilcare breached its contract with him by reducing his salary to $100,000. Bilcare argues that Divenuta's claim must fail because Divenuta was an at-will employee and as such he was subject to prospective changes in the terms of his employment, including a reduction in his salary. I agree and will therefore grant Bilcare's motion for summary judgment as to this claim.

It is well established that under Pennsylvania law, in the absence of "a statutory or

---

[6] The parties do not dispute that although the offer letter was not an "employment contract," it imposed certain contractual obligations on Bilcare with respect to Divenuta's compensation.

contractual provision to the contrary, it is presumed that either party may end an employment relationship at any time, for any or no cause." *Murray v. Commercial Union Ins. Co.*, 782 F.2d 432, 435 (3d Cir. 1986) (citing *Geary v. U.S. Steel Corp.*, 319 A.2d 174, 176 (Pa. 1974)).[7] This power to terminate the employment relationship "at will" carries with it the power to dictate prospective changes in the terms of employment, including an employee's compensation. *See Green v. Edward J. Bettinger Co.*, 608 F. Supp. 35, 42 (E.D. Pa. 1984) ("The undoubted right to terminate an at-will contract necessarily includes the right to insist upon changes in the compensation arrangements as a condition of continued employment."), *aff'd*, 791 F.2d 917 (3d Cir. 1986) (table).

Here, Divenuta has not submitted any evidence to demonstrate that he was anything other than an at-will employee. Indeed, Divenuta's offer letter expressly stated that the "letter does not constitute either an employment contract or a guarantee of employment for a specified period of time." (Offer Letter at 2–3.) The letter also made it clear that "all benefits and company policies may be subject to change." (*Id.* at 2.) In addition, Divenuta signed several other documents that all advised him that he was an at-will employee. For example, Divenuta's employment application—which he signed after he received the offer letter—contained the following acknowledgment:

> If I am hired, I understand that I am free to resign at any time, with or without cause and without prior notice, and the employer reserves the same right to terminate my employment at any time, with or without cause and without prior notice, except as may be required by law. This application does not constitute an agreement or contract for employment for any specified period or definite duration.

(Def.'s Br. Ex. 3 at 3.) Similarly, the introduction to the Employee Guideline Manual that

---

[7] The parties agree that Pennsylvania law applies here.

Divenuta received stated that "[n]othing contained in this manual is intended to be or should be interpreted as a guarantee of employment for any period of time, and employment and compensation can be terminated with or without cause, and with or without notice at any time at the option of the company." (*Id.* Ex. 5 at 3.) Divenuta signed an acknowledgment indicating that he had received the manual and that he understood that "employment is terminable at the will of either the company or myself at any time." (*Id.* Ex. 4.)

Because all of the evidence demonstrates that he was an at-will employee, there was nothing prohibiting Bilcare from prospectively decreasing his salary.

Divenuta's reliance on *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710 (Pa. Super. Ct. 2005), to support his argument is misplaced. In *Sullivan*, the court held that the plaintiff had sufficiently pleaded his breach-of-contract claim to survive dismissal where the plaintiff alleged that, to prevent him from leaving the firm, his employer had agreed to pay him a specified minimum level of compensation the following year; that he accepted this compensation package and continued his employment that next year; and that at the end of that year his employer failed to pay the agreed-upon compensation. *See id.* at 715–16. Whereas in *Sullivan* the employer failed to pay compensation that the plaintiff had already earned, here Bilcare reduced Divenuta's salary prospectively, and Divenuta continued to work at Bilcare after he was informed that his salary would be decreased.

Nor is there any merit to Divenuta's argument that Bilcare breached the implied duty of good faith and fair dealing by reducing his salary.

The Restatement (Second) of Contracts provides that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and in its enforcement."

Restatement (Second) of Contracts § 205 (1981). Adopting the definition set forth in section 1201 of the Uniform Commercial Code, 13 Pa. Cons. Stat. § 1201 (1989), Pennsylvania courts have defined the duty of "good faith" as "[h]onesty in fact in the conduct or transaction concerned." *See Agrecycle, Inc. v. City of Pittsburgh*, 783 A.2d 863, 867 (Pa. Commw. Ct. 2001).[8]

Pennsylvania courts have recognized this duty of good faith,[9] but only in limited situations, and courts have refused to apply the duty of good faith where, for example, doing so would alter or defeat the rights that have been granted a party either by contract or by law. *See Agrecycle*, 783 A.2d at 867; *see also Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Trust Co.*, 560 A.2d 151, 154 (Pa. Super. Ct. 1989) (explaining that courts have "refused to impose a duty of good faith which would modify or defeat the legal rights of a creditor"). Thus, while Pennsylvania courts have held that an at-will employee may assert a claim for breach of the duty of good faith and fair dealing, *see Somers*, 613 A.2d at 1213, they have also held that such a claim cannot, as a matter of law, be maintained for termination of an at-will employment relationship, since under the doctrine of employment at will, an employer may terminate an

---

[8] The definition in the Uniform Commercial Code has since been amended; "good faith" is now defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." 13 Pa. Cons. Stat. Ann. § 1201(b)(20) (West 2011).

[9] Pennsylvania courts have also imposed a similar requirement of good faith under the doctrine of "necessary implication." *See Somers v. Somers*, 613 A.2d 1211, 1214 (Pa. Super. Ct. 1992). Under that doctrine,

> [i]n the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

*Id.* (quoting *Frickert v. Deiter Bros. Fuel Co.*, 347 A.2d 701, 705 (Pa. 1975)).

employee at any time, for any (or no) reason, *see Donahue v. Fed. Express Corp.*, 753 A.2d 238, 243 (Pa. Super. Ct. 2000).

Here, Divenuta contends that Bilcare breached the duty of good faith by reducing his salary. But because all of the evidence demonstrates that Divenuta was an at-will employee and because Bilcare thus had the right not only to terminate him but also to modify the terms of his compensation, Divenuta's claim must fail as a matter of law.

Divenuta further argues that the salary reduction was "used as an attempt to not honor the severance agreement" (Pl.'s Resp. to Def.'s Facts ¶ 20), asserting that Bilcare told him that if he did not accept the salary reduction, Bilcare would deem him to have voluntarily resigned, in which case he would not be entitled to severance. Regardless of Bilcare's motives for reducing his salary, however, Bilcare had the right, as a matter of law, to reduce his salary—just as an employer may terminate an "at-will employee . . . for good reason, bad reason, or no reason at all," *Krajsa v. Keypunch, Inc.*, 622 A.2d 355, 358 (Pa. Super. Ct. 1993), an employer may prospectively alter the employee's compensation for any reason—and the duty of good faith cannot be used to defeat a party's legal rights.

And whether Divenuta might have been found to have been constructively discharged and entitled to severance under the terms of his offer letter had he resigned as a result of this salary reduction is not at issue here.[10] Although Divenuta asserts that he did not accept the salary

---

[10] An employee may be said to have been constructively discharged where an employer "has made working conditions so intolerable that . . . 'a "reasonable person" in the employee's position would have felt *compelled* to resign.'" *Helpin v. Trs. of the Univ. of Pa.*, 969 A.2d 601, 614 (Pa. Super. Ct. 2009) (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)). Courts have recognized that "sharp cuts in an employee's compensation may constitute grounds for a finding of 'intolerability' such as to sustain a claim of constructive discharge." *Helpin*, 969 A.2d at 614; *see also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010)

reduction (Pl.'s Resp. to Def.'s Facts ¶ 20), he continued to work for Bilcare (Def.'s Facts ¶ 20).

Bilcare ultimately terminated him—approximately six and one-half months after the salary

reduction took effect (Def.'s Facts ¶ 27; Def.'s Br. Ex. 11)—but Divenuta does not allege in his

complaint or argue here that he was terminated without cause.[11]

### 2. Failure to Pay Incentive Compensation

Divenuta claims that under the terms of his offer letter, he was guaranteed incentive

payments of at least $25,000 per quarter and that although Bilcare made the first such $25,000

payment, the company failed to make the remaining four payments that he had earned while he

was employed at Bilcare.[12] Bilcare argues that Divenuta's claim must fail and that it is entitled to

summary judgment because the offer letter provides that Divenuta's entitlement to a quarterly

incentive payment was within "the sole and complete discretion of management" and thus

Divenuta "had no contractual entitlement to the $25,000 bonus payments." (Def.'s Br. at 8–9.)

Because I find that the offer letter is ambiguous as to Divenuta's entitlement to incentive

---

(noting that factors relevant to the constructive-discharge determination include "whether the employer . . . reduced [the employee's] pay or benefits" (internal quotation marks omitted)).

[11] Divenuta filed his complaint before Bilcare terminated him. In his deposition, Divenuta testified that his termination was "wrongful," (Divenuta Dep. at 14:2–3; *see also id.* at 40:17, 41:21–24), but Divenuta did not amend his complaint to incorporate this new allegation; nor does he argue in his brief in opposition to Bilcare's motion for summary judgment that he was terminated without cause.

[12] Divenuta claims that Bilcare failed to make "the second quarterly incentive payment of $25,000, the third quarterly incentive payment of $25,000, the fourth quarterly incentive payment of $25,000, and the incentive payment of $25,000 for the quarterly period ending on June 30, 2009." (Compl. ¶ 24; Pl.'s Br. at 6.) In his prayer for relief in his complaint, however, Divenuta requests "[p]ayment of the unpaid incentive pay in the amount of $75,000 plus interest since the payment due dates of August 31, 2008, November 30, 2008, and March 31, 2009." (Compl. *ad damnum* clause.)

compensation and "thus presents a question of interpretation for [the fact-finder]," *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009), I will deny Bilcare's motion for summary judgment as to this claim.

"The paramount goal of contractual interpretation is to ascertain and give effect to the intent of the parties." *Morningstar v. Hallett*, 858 A.2d 125, 129 (Pa. Super. Ct. 2004). "Where the meaning of a written contract is clear and unambiguous, its interpretation and construction are for the court, not the [fact-finder]." *Hewes v. McWilliams*, 194 A.2d 339, 342 (Pa. 1963). But "where the language chosen by the parties is ambiguous, deciding the intent of the parties becomes a question of fact for [the fact-finder]." *Am. Eagle Outfitters*, 584 F.3d at 587 (citing *Cmty. Coll. of Beaver Cnty. v. Cmty. Coll. of Beaver*, 375 A.2d 1267, 1275 (Pa. 1977)).

Thus, as a preliminary matter, a court must determine, as a matter of law, whether the terms of a contract are clear or ambiguous. *See id.* "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). In determining whether a contract is ambiguous, the meaning of the contract's language should not be distorted, and "a court must not rely upon a strained contrivancy" to establish an ambiguity. *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982).

In this case, I cannot conclude that there is only one reasonable interpretation of the offer letter's incentive-compensation provision. The provision reads as follows:

> You will be eligible for the greater of (a) an override of ½% on gross revenue (less pass-through costs) or (b) 50% of your salary. During the first year of employment and for the purposes of incentive pay, your salary will be considered your base pay plus the sign-on bonus. . . . Incentives should be calculated monthly and paid quarterly within the month following the end of the calendar quarter. Incentive pay

plans are subject to the sole and complete discretion of management. Incentive payments are deemed earned if you are in an active employment status at the time payment is due.

(Offer Letter at 1.)

The provision could be interpreted, as Bilcare argues, to mean that Divenuta's entitlement to an incentive payment was within the discretion of management—that is, although the amount of any incentive payment was to be determined by the formula described in the offer letter, whether Divenuta was entitled to receive an incentive payment in the first place was within the "sole and complete discretion of management." But there is no evidence that Bilcare ever informed Divenuta that, in the exercise of its discretion, he would not be receiving an incentive payment for a given quarter. (*See* Divenuta Dep. at 291:21–23.) Moreover, the sentence that Bilcare relies on—"Incentive pay plans are subject to the sole and complete discretion of management."—refers to incentive pay *plans*,[13] not incentive *payments*, and one could reasonably interpret that sentence to mean that although management had the discretion to discontinue the incentive pay plan or otherwise alter the terms of the plan, as long as the plan described in the offer letter remained in effect Divenuta would be entitled to receive a quarterly incentive payment as determined by the prescribed formula. Divenuta argues that this second

_____

[13] There is nothing in the record indicating whether this incentive plan—or a similar plan—applied to other Bilcare employees, or whether, to the extent that other employees did participate in such a plan, Bilcare made incentive payments to those employees. In his deposition, Divenuta testified that he did not know whether anyone else had a "commission structur[e]" similar to his (Divenuta Dep. at 258:20–23)—during his deposition, Divenuta used the terms "bonus" and "commission" interchangeably to refer to the quarterly incentive payments described in his offer letter (*see, e.g.*, *id.* at 11:18–24, 293:8–15, 314:13–316:6)—and when asked whether other employees complained that they had not been paid their commissions, he testified that he did not recall whether they claimed that they did not get paid but that he knew that "there were complaints . . . that the commissions were not paid in a timely fashion" (*id.* at 259:3–10).

interpretation—and his corresponding contention that he was entitled to quarterly incentive payments as long as he was employed by Bilcare—is supported by the last sentence: "Incentive payments are deemed earned if you are in an active employment status at the time payment is due." Bilcare, on the other hand, argues that this language is meant only to "ensure that a terminated employee cannot claim that he had already 'earned' a portion of a bonus . . . that was not due to be paid until after his termination date." (Reply Mem. of Law in Further Supp. of Def. Bilcare, Inc.'s Mot. for Summ. J. ("Def.'s Reply Br.") at 5.) Both interpretations are reasonable.[14]

Given this ambiguity, I must deny Bilcare's motion for summary judgment; it is for the trier of fact to interpret the offer letter and determine whether Divenuta was guaranteed quarterly incentive payments.[15]

_____

[14] Divenuta finds further support for his interpretation in the salary-reduction notice that he received, which stated: "At the present time, your commission structure will remain unchanged." (Def.'s Br. Ex. 9 at 2.) Divenuta testified that he interpreted that statement as "validation of the fact that [he] was still owed [his] [$]25,000 per quarter." (Divenuta Dep. at 257:13–17.)

[15] Divenuta also contends that Bilcare breached the duty of good faith and fair dealing by "breaching its promise as to the guaranteed incentive payments." (Pl.'s Br. at 9.) Courts have generally found that a claim for breach of the duty of good faith is subsumed in a breach-of-contract claim—at least where, as here, the allegations underlying the two claims are substantially similar. *See LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384, 392 (Pa. Super. Ct. 2008); *see also In re Chambers Dev. Co.*, 148 F.3d 214, 227 n.10 (3d Cir. 1998) (noting that claim for breach of the duty of good faith and fair dealing was inherent in plaintiff's contract claim because "the obligation to deal in good faith arises out of the underlying contract"); *Oehlmann v. Metro. Life Ins. Co.*, 644 F. Supp. 2d 521, 534 (M.D. Pa. 2007) (explaining that breach of the duty of good faith "is tantamount to a breach of contract"); *McHale v. NuEnergy Group*, No. 01-4111, 2002 U.S. Dist. LEXIS 3307, at *23 (E.D. Pa. Feb. 27, 2002) (finding that "Pennsylvania law would not recognize a claim for breach of [the] covenant of good faith and fair dealing as an independent cause of action separate from the breach of contract claim" where the allegations underlying the claim for breach of the duty of good faith are "essentially the same" as those underlying the breach-of-contract claim). Accordingly, I need not address this claim now. I note, however, that the duty of good faith "cannot be used to override an express . . . term" in the offer letter, but may be used "as an interpretive tool to determine the

14

### 3. Damages

Bilcare asserts that to the extent its motion for summary judgment with respect to Divenuta's breach-of-contract claims is denied, Divenuta's claim for damages for the decline in his credit score should be stricken. Divenuta claims that as a result of Bilcare's failure to pay compensation owed to him, he failed to pay certain bills, which in turn contributed to a decline in his credit score. Bilcare argues that, except for his testimony as to his "vague recollection" of his credit score before he began working at Bilcare, Divenuta has not offered any evidence to support his claim that his credit score declined. (Def.'s Br. at 13.) Bilcare further argues that even if Divenuta could establish that his credit score decreased, he has not offered sufficient proof that any such decrease was the proximate result of Bilcare's alleged breach. I agree, and I will therefore strike Divenuta's claim for damages for the decline in his credit score.

Under Pennsylvania law, "a party seeking damages for breach of contract must be able to prove such damages with reasonable certainty." *Exton Drive-In, Inc. v. Home Indem. Co.*, 261 A.2d 319, 324 (Pa. 1969) (internal quotation marks omitted). The plaintiff "must show a causal connection between the breach and the loss." *Logan v. Mirror Printing Co. of Altoona, Pa.*, 600 A.2d 225, 226 (Pa. Super. Ct. 1991) (citing *Exton Drive-In*, 261 A.2d 319). Damages may not be awarded "on the basis of speculation or conjecture." *Carroll v. Phila. Hous. Auth.*, 650 A.2d 1097, 1100 (Pa. Commw. Ct. 1994). "The Superior Court [of Pennsylvania] has observed that the test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable

---

parties' justifiable expectations in the context of [Divenuta's] breach of contract action." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000).

damages." *Logan*, 600 A.2d at 227 (internal quotation marks omitted).

Although Bilcare requested, as part of discovery, documentation from Divenuta relating to the alleged decline in his credit rating (*see* Def.'s Reply Br. Ex. 1, Def.'s 1st Request for Produc. of Docs., ¶¶ 19–21; *id.* Ex. 2, Letter from William J. Simmons to Wayne A. Ely (July 28, 2010)), and although Divenuta asserts that his "credit score is a matter of record and if necessary, one could make an inquiry to the credit raters and find out what [his] exact credit score was during any particular time period" (Pl.'s Br. at 20), he has not produced such documentation or any other evidence to support his claim that his credit score declined. Nor has he submitted any evidence demonstrating a causal connection between Bilcare's failure to pay incentive compensation allegedly owed to him under the terms of his offer letter and any alleged decline in his credit score.

Moreover, even if Divenuta could prove that his credit score declined as a result of Bilcare's alleged breach, to recover damages Divenuta would still have to demonstrate that the decline in his credit resulted in a "tangible pecuniary loss." *Johnson v. Four States Enters., Inc.*, 355 F. Supp. 1312, 1318 (E.D. Pa. 1972) ("[L]oss of credit, standing alone, is not proof of damage, unless the loss of credit connects itself with some tangible pecuniary loss of which the loss of credit was the cause." (citing *Smith v. W. Union Tel. Co.*, 24 A. 1049 (1892), and *Eckel v. Murphey*, 15 Pa. 488, 495 (1850))), *aff'd*, 495 F.2d 1368 (3d Cir. 1974) (table). Divenuta has proffered no evidence to support such a finding.

No reasonable fact-finder could award this item of damages on the basis of the evidence submitted, and I will therefore strike Divenuta's claim for damages for the alleged decline in his credit score.

## B.      Promissory-Estoppel Claim

In the alternative, Divenuta claims that he is entitled to recover for the reduction in his salary, as well as for Bilcare's failure to pay incentive compensation, under the theory of promissory estoppel. Divenuta asserts that Bilcare promised to adhere to the compensation scheme set forth in his offer letter and assured him that the incentive-compensation payments were guaranteed, and claims that he would not have left his prior employer and accepted the position at Bilcare but for those promises. Bilcare argues first that Divenuta's claim for the reduction in his salary is precluded because Divenuta cannot assert promissory estoppel as an exception to the employment-at-will doctrine, and second that his claim for Bilcare's failure to pay incentive compensation is precluded because Divenuta's entitlement to incentive compensation was governed by the terms of his offer letter. I agree that Divenuta may not rely on the doctrine of promissory estoppel here and will therefore grant Bilcare's motion for summary judgment as to Divenuta's promissory-estoppel claims.

The doctrine of "[p]romissory estoppel allows the court to enforce a party's promise that is unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee, (2) the promise does induce action or forbearance by the promisee, and (3) injustice can only be avoided by enforcing the promise." *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990); *see also Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000). This doctrine may be invoked "where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise." *Carlson*, 918 F.2d at 416.

As Divenuta acknowledges, however, under Pennsylvania law, promissory estoppel is not

an exception to the doctrine of employment at will. *See Paul v. Lankenau Hosp.*, 569 A.2d 346, 348 (Pa. 1990). Thus an employee cannot maintain a promissory-estoppel claim for termination of an at-will employment relationship, since under the doctrine of employment at will, an employer may terminate an employee at any time, for any (or no) reason. *See id.* ("An employee may be discharged with [or] without cause, and our law does not prohibit firing an employee for relying on an employer's promise."). The Pennsylvania Supreme Court reasoned that allowing an employee to claim promissory estoppel in cases where the law declares that no implied contract exists would undercut the at-will employment doctrine. *See id.*

Although Divenuta's promissory-estoppel claim does not involve his termination, similar reasoning precludes his claim for the reduction in his salary. As discussed in connection with Divenuta's breach-of-contract claim, the power to terminate an employee at will necessarily carries with it the power to prospectively alter the employee's terms of employment, including his compensation, as a condition of continued employment. *See Green*, 608 F. Supp. at 42. Divenuta's claim for the reduction in his salary must therefore fail as a matter of law.

Nor can Divenuta maintain a promissory-estoppel claim for Bilcare's failure to pay incentive compensation. The doctrine of promissory estoppel does not apply when the parties have entered into an enforceable agreement governing their relationship. *See Carlson*, 918 F.2d at 416 (concluding that relief under a promissory-estoppel claim was unwarranted where the parties had formed an enforceable contract). Here, because Divenuta's entitlement to incentive compensation was set forth in his offer letter, his promissory-estoppel claim is precluded. To the extent that Divenuta has a claim, it must be for breach of contract, not promissory estoppel.

## C.    Wage Payment and Collection Law

Finally, Divenuta asserts a claim under the WPCL for the quarterly incentive payments, as well as severance, that he alleges are owed to him under the terms of his offer letter.

As a preliminary matter, I note that Divenuta did not assert a claim in his complaint for severance; he asserts this claim for the first time in his brief in opposition to Bilcare's motion for summary judgment. Generally, "[a] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) (not precedential) (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996)). And "[c]ourts have been reluctant to allow plaintiffs to add new theories of liability after summary judgment arguments have been completed." *Laurie v. Nat'l Passenger R.R. Corp.*, 105 F. App'x 387, 392 (3d Cir. 2004) (not precedential) (citing district court cases holding that new claims first raised in opposition to motion for summary judgment were too late). Even assuming that it was timely raised, however, his claim for severance must fail.

It is well established that "the WPCL does not create a new right to compensation, but rather, merely establishes a right to enforce payment of wages and compensation that the employer has legally obligated itself to pay." *Scully v. US WATS, Inc.*, 238 F.3d 497, 516–17 (3d Cir. 2001).[16] Thus, to sustain his wage-payment claims, Divenuta must demonstrate that he was

---

[16] As the Superior Court has explained:
Pennsylvania enacted the WPCL to provide a vehicle for employees to enforce payment of their wages and compensation held by their employers. The underlying purpose of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy when an employer breaches its contractual obligation to pay wages. The WPCL does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment

contractually entitled to compensation and that he was not paid. *See Sullivan*, 873 A.2d at 716.

Divenuta asserts that under the terms of his offer letter, he is entitled to a severance payment of $90,000—which is six months' salary calculated on the basis of his initial salary of $180,000 per year. With respect to severance, the offer letter provided: "In the event your employment terminates involuntarily for any reason other than cause, disability, violation or perceived violation of an Agreement with a previous employer, you will be provided a severance package of six months['] salary and health benefit continuation." (Offer Letter at 2.) Bilcare asserts that Divenuta was terminated for cause and thus is not entitled to any severance. In his brief, Divenuta does not dispute that he was terminated for cause,[17] and his failure to do so is fatal to his claim for severance. Divenuta argues instead that by failing to pay him the installments of his sign-on bonus "when they were due and owing," Bilcare breached the terms of the offer letter. (Pl.'s Br. at 16.) He asserts that "[t]his breach was ongoing and consistent throughout the entire employment relationship," and that as a consequence, he "was entitled to trigger the severance provision at any time." (*Id.*) This argument makes no sense. Divenuta continued to work, and there is nothing in the offer letter that suggests that a breach of the letter's provision regarding his sign-on bonus triggers Divenuta's entitlement to severance.[18]

Divenuta also asserts a claim for the quarterly incentive payments that he alleges are

_____

of wages and compensation to which an employee is otherwise entitled by the terms of an agreement.

*Hartman v. Baker*, 766 A.2d 347, 352 (Pa. Super. Ct. 2000) (internal quotation marks and citations omitted).

[17] See note 11 above.

[18] I find it noteworthy that Divenuta did not seek severance in his breach-of-contract claim.

owed to him under the terms of his offer letter. Bilcare argues that Divenuta's claim must fail because Divenuta was not contractually guaranteed the quarterly incentive payments. As discussed in connection with Divenuta's breach-of-contract claim, however, the offer letter is ambiguous as to Divenuta's entitlement to incentive compensation. I must therefore deny Bilcare's motion for summary judgment as to this WPCL claim.[19]

Finally, when Divenuta filed his complaint on August 11, 2009, he alleged that Bilcare had failed to pay the final $5,000 installment of his sign-on bonus and, in his prayer for relief, sought such payment, plus interest. (Compl. ¶ 21, *ad damnum* clause.) On April 13, 2010, Bilcare sent Divenuta's attorney a check payable to Divenuta in the amount of $5,000 to satisfy its obligation. Although Divenuta's claim for payment of that final installment is now moot, he claims that he is still entitled to liquidated damages under the WPCL and in his brief requests that he be granted summary judgment as to this claim.

To the extent that Divenuta believes that he is entitled to summary judgment, he should have filed a motion for summary judgment, rather than requesting summary judgment in his brief in opposition to Bilcare's motion. Nonetheless, because a court may enter summary judgment *sua sponte* as long as the losing party has been given sufficient notice, *see Gibson v. Mayor of Wilmington*, 355 F.3d 215, 222 (3d Cir. 2004), and because Divenuta's brief put Bilcare on notice that Divenuta sought summary judgment and Bilcare had the opportunity to respond—although it chose not to—I will consider Divenuta's request for summary judgment.

---

[19] Although Divenuta did not file a motion for summary judgment, in his brief in opposition to Bilcare's motion, he contends that he is entitled to summary judgment on this issue. Given the ambiguity in the offer letter, even if his motion for summary judgment had been properly made, it would similarly be denied.

The WPCL provides, in relevant part:

> Where wages remain unpaid for thirty days beyond the regularly scheduled payday, or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employee of a proper claim or for sixty days beyond the date of the agreement, award or other act making wages payable, . . . and no good faith contest or dispute of any wage claim . . . exists accounting for such non-payment, the employee shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater.

43 Pa. Stat. Ann. § 260.10. Bilcare has made no assertion that its failure to timely pay the final installment of Divenuta's sign-on bonus was the result of a good-faith dispute as to Divenuta's entitlement to such payment, and there is no evidence to suggest that there was any such dispute.[20] Accordingly, under the plain language of the statute, Divenuta is entitled to $1,250 (25 percent of $5,000) in liquidated damages.

Divenuta also contends that he is the "prevailing party" under the WPCL and as such is entitled to attorney fees with respect to his claim for the final installment of his sign-on bonus, notwithstanding that Bilcare voluntarily paid that installment after Divenuta filed his complaint. The WPCL provides, in relevant part: "The court in any action brought under this section shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow costs for reasonable attorneys' fees of any nature to be paid by the defendant." 43 Pa. Stat. Ann. § 260.9a(f). As discussed above, I am going to deny Bilcare's motion for summary judgment as to Divenuta's WPCL claim for incentive compensation. Because Divenuta would be entitled to attorney fees if he prevailed on that claim, it does not make sense to discuss attorney fees at this juncture.

---

[20] The Pennsylvania Superior Court has held that the burden is on the defendant to establish that there is a good-faith dispute as to the plaintiff's entitlement to compensation. *See Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 575 (Pa. Super. Ct. 2006). In its reply brief, Bilcare did not even address Divenuta's contention that he is entitled to liquidated damages.

Accordingly, I will defer judgment on this issue pending resolution of his other WPCL claim.

## IV.     CONCLUSION

Because Divenuta was an at-will employee, Bilcare had the right not only to terminate Divenuta at will but also to insist upon changes in the terms of his employment, including his salary, as a condition of continued employment. As a result, Divenuta's claims regarding the reduction in his salary must fail as a matter of law, and I will thus grant Bilcare's motion for summary judgment as to those claims.

Divenuta also claims that he is entitled to severance because Bilcare breached the terms of his offer letter. There is no merit to this argument, however, and I will therefore grant Bilcare's motion for summary judgment as to his severance claim.

On the other hand, because Divenuta's offer letter is ambiguous as to his entitlement to incentive compensation, I will deny Bilcare's motion for summary judgment as to Divenuta's breach-of-contract and WPCL claims for incentive compensation. The fact that his entitlement to incentive compensation is governed by his offer letter, however, precludes his promissory-estoppel claim for incentive compensation, and I will thus grant Bilcare's motion for summary judgment as to that claim.

Bilcare contends that if its motion for summary judgment with respect to any of Divenuta's breach-of-contract claims is denied, Divenuta's claim for damages for the decline in his credit score should be stricken. Because Divenuta has not submitted any evidence to support this damages claim, I will grant Bilcare's request.

Finally, Divenuta seeks liquidated damages and attorney fees under the WPCL with

respect to his claim for the final installment of his sign-on bonus, which Bilcare did not pay until about eight months after Divenuta filed his complaint. Because there was no good-faith dispute as to Divenuta's entitlement to that bonus payment, I will award Divenuta liquidated damages of $1,250. But I will defer judgment on the issue of attorney fees pending resolution of Divenuta's remaining WPCL claim for incentive compensation.

An appropriate order accompanies this memorandum.